114 P.3d 958

**STATE of Hawai'i, Plaintiff–Appellee/Cross–Appellant,**

v.

**Samie Raspado CALARO, Defendant–Appellant/Cross–Appellee.**

**No. 26410.**

Intermediate Court of Appeals of Hawai'i.

June 9, 2005.

Edward K. Harada, Deputy Public Defender, State of Hawai‘i, on the briefs, for defendant-appellant/cross-appellee.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee/cross-appellant.

WATANABE, Acting C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

Samie Raspado Calaro (Defendant) appeals the January 26, 2004 judgment of the Circuit Court of the First Circuit (circuit court)[1] that convicted him, upon a jury's verdict and as charged, of murder in the second degree.[2] We affirm, and hence render the State's cross-appeal moot.

1. The Honorable Virginia Lea Crandall presided.

2. Hawaii Revised Statutes (HRS) § 707–701.5(1) (1993) provides, in pertinent part, that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

The sole defenses asserted at trial were lack of penal responsibility, popularly known as the "insanity defense," HRS § 704–400(1) (1993), and

## I. Background.

### A.

The trial started on July 24, 2003. Evidence adduced revealed the following essentials. Police officer Reginald Caneda (Officer Caneda) testified that on July 27, 2002, at about 8:05 in the morning, he was sent by dispatch to an address in Wahiawa to respond to a 911 call. En route, he heard dispatch upgrade the assignment to a "stabbing call." When Officer Caneda got there, he encountered a woman. "I got out of my car, approached her, she informed me that her sister and her sister's boyfriend were involved in a domestic dispute and that he had possibly pulled a knife on her." The woman told Officer Caneda that Defendant was her sister's boyfriend.[3]

The woman directed Officer Caneda around the side of her house to a studio apartment at the rear of the property. Officer Caneda drew his nine-millimeter Smith and Wesson, announced his office and called for Defendant to come out. For awhile, and despite repeated calls by Officer Caneda, no response came from the locked door of the apartment. Then, Defendant yelled from inside the apartment, "everything's okay, everything's okay. You don't need to be here, everything's okay." Defendant's tone of voice was, "Very calm, concise." Officer Caneda persisted, telling Defendant several times that he had to come out and talk in order to assure the officer that everything was indeed okay.

Eventually, Defendant yelled from a window in an angry voice, "I'm coming." The apartment door swung open, and there stood a woman, the sister, with Defendant standing behind her looking "very scared and timid." The entire front of the woman's clothing was imbrued in blood, and she seemed to be in distress. She was having difficulty standing, and Defendant appeared to be holding her up with his hands on her shoulders. Defendant's clothing was also copiously covered in blood. Officer Caneda drew down on Defendant and repeatedly ordered him to lay the woman down on the threshold. Finally, Defendant complied. But suddenly, Defendant "dove" to the ground behind the woman, pushed her up and hid behind her body, as if to shield himself from the officer. Officer Caneda commanded Defendant to get away from the woman. After several such directives, Defendant stood up and stepped away. At that point, a covering police officer arrived, and the two officers handcuffed Defendant.

Officer Caneda then turned his attention to the woman. "I noticed several injuries to her—to her hands, a major injury to her forearm, so I further inspected her abdomen area and found multiple stab wounds." Officer Caneda took some clothes from a nearby clothesline and applied direct pressure to the woman's wounds. "And she kept telling me that it was too late, it was too late and that she wasn't going to make it. So I tried to divert her attention, tried to talk about her family and friends and people that would want her to be around so she would continue to fight." The covering police officer, Thomas Merrill (Officer Merrill), also talked to the woman. The woman lost consciousness about eight minutes later.

Officer Merrill testified on direct examination about his exchange with the wounded woman:

Q. Was this woman awake or unconscious at the time?

the mitigating defense of extreme mental or emotional disturbance. HRS § 707–702(2) (1993).

HRS § 704–400(1) provides: "A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law."

At the time of the offense, HRS § 707–702(2) (1993) provided: "In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be."

3. Samie Raspado Calaro was forty-four years old when he killed his girlfriend. She was fifty-three years old.

A. She was awake, the female was awake but she appeared to be in what we call a medically critical condition.

Q. Was she able to speak?

A. Yes. I—I wanted to talk to her before she either went unconscious or she was taken away from the scene to see what—what I could find out.

Q. Did you ask her any questions?

A. I bent down at her face and I asked her the question, Who stabbed you?

Q. What was her response?

A. Her response was, Samie Calaro.

Q. Did you ask anything next?

A. I asked her, Who is that? And then she answered me, My boyfriend. Then I asked her, What is your last name? And she—she said something that began with M but I couldn't understand it because her speech was starting to become unintelligible. My next question was, What is your first name? And she told me, Ruby. And my last question was that I asked her, What is your Social Security number? She gave me a Social Security number, I don't have it memorized but I have it on record.

The woman arrived at the Wahiawa General Hospital emergency room without a pulse, and following unsuccessful resuscitation efforts was pronounced dead at about 9:53 a.m. Later that day, a police evidence specialist went to the crime scene and recovered many knives and other incising implements from the small studio apartment. Among them were three knives with blood on their single-edged blades.

The chief medical examiner for the City and County of Honolulu, Kanthi Von Guenthner (Dr. Von Guenthner), conducted the autopsy. Dr. Von Guenthner testified that the decedent suffered eight injuries to her legs and abdomen.[4] The decedent also had numerous defensive injuries to her hands and her left forearm and elbow, the elbow injury sustained through-and-through.

The four stab wounds to the abdomen cut through vital structures and blood vessels inside the abdomen, which resulted in not only external bleeding, but massive bleeding into the abdominal cavity as well: "the kidney, the blood vessels leading to the kidney, the intestines both small and large, mesentery, which is the part that connects the loops of intestines to the abdominal wall and also the fat that covers this area, all those areas were—show injuries with bleeding into the abdominal cavity." Dr. Von Guenthner concluded: "Her cause of death was from exsanguination, which means loss of blood, due to injuries to her abdominal organs sustained as a result of the stab wounds.... And I examined all her organs and she did not have any other disease process that could have contributed or caused her death." Dr. Von Guenthner also opined that the injuries she observed were consistent with the use of a knife or knives with a single-edged blade, like the bloody knives recovered from the crime scene.

**B.**

During the trial, the State proffered jury instructions. Among them were proposed instructions on the mitigating defense of extreme mental or emotional disturbance (EMED) under Hawaii Revised Statutes (HRS) § 707–702(2) (1993). These instructions read, in pertinent part:

If and only if you unanimously find that all the elements of murder in the second degree have been proven by the prosecution beyond a reasonable doubt, then you must consider whether, at the time defendant caused the death, he was under the

4.
1. A stab wound to the back of the left thigh, which did not penetrate any vital structures or blood vessels.
2. An incised wound on the left knee.
3. An incised wound on the front side of the calf area of the left leg.
4. A wound on the side of the right thigh.
5 & 6. Two potentially fatal stab wounds to the front of the abdomen, midline and left of midline, respectively, both of which went through the abdominal wall and sliced the small intestine, the mesentery and associated blood vessels.
7 & 8. Two potentially lethal stab wounds to the left side of the abdomen, anterior and posterior, respectively, both of which went through the abdominal wall and perforated the left kidney and associated blood vessels, the former of which punctured the large intestine as well.

influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a *reasonable* person in the defendant's situation under the circumstances of which the defendant was aware or as the defendant believed them to be.

. . . .

The Defendant's self-control, or lack of it, at the time of the killing is a *significant, even determining,* factor in deciding whether the killer was under the influence of an extreme mental or emotional disturbance.

(Emphases supplied; citations omitted.)

Defendant followed by filing his own proposed jury instructions. On the EMED defense, Defendant proposed an instruction identical in all relevant respects to the first of the foregoing instructions, except for redaction of the word "reasonable" emphasized above. As to the second of the foregoing instructions, Defendant also proposed an instruction identical in all material respects, except for omission of the phrase "significant, even determining," emphasized above, and addition of the following:

An extreme mental or emotional disturbance is the mental or emotional state of an individual who has an extreme mental or emotional reaction to an unusual and overwhelming stress as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.

(Citations omitted.)

At the end of the evidentiary part of the trial, on July 30, 2003, the State filed a motion to preclude any argument or jury instruction on the EMED defense. The State cited a dearth of evidence demonstrating that Defendant was either subjectively under the influence of an extreme mental or emotional disturbance at the time of the offense—particularly because Defendant did not testify—or objectively so. The State also argued, as a matter of law, that the "physical or mental disease, disorder, or defect" inte-

gral to Defendant's insanity defense, HRS § 704–400(1) (1993), could not constitute an objectively reasonable basis for his EMED defense. Finally, the State pointed out that the three experts, appointed to a panel to examine Defendant and report on his fitness and penal responsibility, were not similarly instructed by the circuit court to render an opinion on the EMED defense.

In following memoranda, Defendant claimed there was sufficient evidence of his subjective and objectively reasonable disturbance at the time of the offense, his refusal to testify and the lack of a germane charge to the three-panel notwithstanding. Defendant also maintained that his proposed instructions on the EMED defense were the legally correct instructions.

During the settlement of jury instructions, the circuit court first heard and denied the State's motion to preclude the EMED defense.[5] The parties then placed their respective positions on the proposed jury instructions, as summarized above, orally into the record. Ultimately, the circuit court instructed the jury on the EMED defense, in pertinent part as follows and over the objections of both parties:

If and only if you unanimously find that all the elements of Murder in the Second Degree have been proven by the prosecution beyond a reasonable doubt and you also unanimously find that the Defendant did not prove the affirmative defense of not guilty by reason of physical or mental disease, disorder or defect, then you must consider whether, at the time Defendant caused the death, he was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a *reasonable* person in the Defendant's situation under the circumstances of which the Defendant was aware or as the Defendant believed them to be.

. . . .

The question of the Defendant's self-control, or the lack of it, at the time of the

---

**5.** On August 12, 2003, The Circuit Court of the First Circuit filed a summary order denying the

offense, is a *significant* factor in deciding whether he was under the influence of an extreme mental or emotional disturbance.

(Emphases supplied.)

During his closing argument, Defendant conceded the material elements of murder in the second degree and abandoned his insanity defense, arguing only for his EMED defense. The circuit court tasked the jury to deliberations at 11:11 a.m. on August 1, 2003. By 2:29 that afternoon, the jury had reached its verdict of guilty as charged.

## C.

Before the trial, the State had filed several motions and notices of intent. In its motion in limine no. 2, the State moved the circuit court to issue an order

1. Prohibiting any comment upon or reference to any toxicology tests done on [the decedent].

2. Prohibiting any comment upon or reference to the presence of methamphetamine and amphetamine in [the decedent's] blood at the time of her death.

The State was referring to a toxicology report[6] appended to the autopsy report. In light of Defendant's stated intention to rely at trial solely on the insanity and EMED defenses, the State reasoned that the toxicology report was irrelevant and highly inflammatory and should be excluded.

At the hearing on the State's motion in limine no. 2, the State again argued that the toxicology report was irrelevant and highly inflammatory. In addition, the State represented that Dr. Von Guenthner "will testify to a reasonable degree of medical certainty that the presence of amphetamine and/or methamphetamine had absolutely no connection, did not contribute in any way to the cause or matter—or manner of the victim's

death." The State also represented that Dr. Von Guenthner could not, on the strength of the toxicology report alone, opine about what effect, if any, the drugs had upon the decedent. Hence the defense would have no evidence—of its own or otherwise—upon which to establish any relevance for the toxicology report. The State complained that the toxicology report would be distracting to the jury, and charged that the defense's proffer was a thinly-disguised and unadulterated attempt to smear the decedent.

In response, the defense detailed why the toxicology report should be evidence:

[FIRST DEFENSE COUNSEL]: Your Honor, we would submit, we would argue against this motion, and we would ask for the Court to admit this evidence as relevant to the complainant's cause of death and as relevant to the mitigation defense of extreme mental or emotional disturbance. The cause of death was listed as exsanguination, and I believe it was a fatal injury to the kidney. However, as the toxicology report that I just handed to the Court indicates, she is at .25 milligrams per liter level of methamphetamine was detected in her system. As that chart indicates, they have a—they list a potentially toxic range, and that's the exact wording on there, it says potentially toxic. Her level of .25 is in the potentially toxic range, which that chart there lists as between .2 and .6, and the chart also lists effective level as being below that, .01 to .10.

Because her methamphetamine level, according to the toxicology report itself, is apparently and clearly in the potentially toxic range, I feel we should be entitled to cross-examination on this issue. This is for the jury to decide what the exact cause of death was and whether the methamphetamine level had any—any effect on the

State's July 30, 2003 motion.

**6.** The toxicology report showed the following test results:

> d-Methamphetamine = 0.25 mg/L
> d-Amphetamine = 0.09 mg/L

Blood Methamphetamine Ranges
Effective Level: (0.01-0.10 mg/L)
Potentially Toxic: (0.2-0.6 mg/L)

Blood Amphetamine Ranges
Effective Level: (0.03-0.25 mg/L)
Potentially Toxic: (0.2-3.0 mg/L)

cause of death at all. That is for them to decide.

Regarding [the State's] proffer on what Dr. Von Guenthner's testimony would be, they say that, without further information, they're saying Dr. Von Guenthner cannot say whether this level of methamphetamine had any effect on the complainant, that appears to be—that's the gist of what I detected they were saying. She cannot—apparently she cannot say whether this level of methamphetamine did affect the cause of death, but she cannot say that it did not affect the cause of death. So the cause of death ultimately is what the jury should decide, and we feel that a potentially toxic level of methamphetamine is something that is valid and fair for the jury to consider, it gives them a full, accurate picture of the complainant's condition at the time of her death.

With regard to my argument that evidence of her drug use at the time of her death is relevant to an EMED defense, the photographs of the scene depict a—what looks like signs of struggle, there are objects strewn about, the place is very messy. It would be relevant to show the decedent's physical state at the time of her death. This evidence would assist the jury in determining what happened and how it happened. To withhold this evidence from the jury we feel would be—it would be unfair and unwise to withhold this type of evidence from the jury.

Regarding the statements, and the third reason that I would ask for this evidence to be admitted is because if the Court rules that the complainant's statements to Genevieve De Vincent, her friend, [concerning Defendant's abuse of the complainant and the purported new man in complainant's life at the time of the offense,] are going to come in, then we would submit any evidence of the complainant's drug use should also likewise be relevant. They are proffering the statements of Genevieve De Vincent as a close friend and confidante of the complainant. The complainant's drug use, if the—if Ms. De Vincent is gonna say that she was not aware of any drug use, she would be surprised that there was any drug use, then this is relevant to the close-

ness or maybe the lack thereof of closeness of the relationship between Ms. De Vincent and the complainant. It's also relevant—it would also then be a relevant question whether at the time the complainant made these statements, whether she was under the influence of any drugs at the time she made these statements to Ms. De Vincent, and it goes to the reliability of the complainant's statements to Ms. De Vincent at the time they were made. So for all of theses reasons, the toxicology results should be admitted.

And I just have one more thing I want to add to that. Sorry, let me just find my . . . the—I reviewed the state's memoranda, and in here they quote from a case called Lyons versus United States, that evidence of the decedent's illegal drug use in front of a jury is highly inflammatory, allegation which may generate unwarranted prejudice from the jury because of hostility based on the general odium of narcotics use. Now, they're saying that there would be a lot of hostility and odium generated toward the complainant because of her drug use, then, in this case, you know, there is going to be similar evidence presented against my client, and it would be only fair for the jury to get a full and accurate picture of what happened, and not just allegations of drug use by the defendant or drug use in the past by the defendant, but that there also was this same type of evidence against the complainant, and to withhold this, like—like I said before, would be misleading the jury, and it would be unfair. And I believe my colleague has another point he'd like to add. That's all I have.

. . . .

[SECOND DEFENSE COUNSEL]: Yes, Your Honor. Just as a general proposition, just because Dr. Von Guenthner testifies one way, that maybe the state hopes she will, you know, the jury's instructed—an expert witness, like any lay witness, the jury's free to reject or accept any of the testimony they see fit, so to that extent, when [first defense counsel] cross-examines Ms. Von Guenthner or the medical examiner, she's exercising, on Mr. Ca-

laro's behalf, his full right to confront and cross-examine that witness, and the jury's free to reject or accept anything she may have to say. To the extent that [first defense counsel] feels that the issue of toxicology and having the methamphetamine is necessary, I believe she's entitled to that.

The circuit court initially took the State's motion in limine no. 2 under advisement. Later, however, the circuit court scheduled a further pretrial hearing to receive Dr. Von Guenthner's testimony on her opinions, as the State had represented them to the circuit court.

At the hearing, Dr. Von Guenthner testified that she did indeed take the toxicology report into account in her autopsy examination, but that the cause of death was "blood loss from multiple stab wounds to [the] abdominal organs." Dr. Von Guenthner confirmed her opinion that the methamphetamine and its metabolite, amphetamine, played no part in the etiology of death. Dr. Von Guenthner elaborated: "She had fatal stab wounds that incised her blood vessels to the kidney, through the kidney, the mesentery, which is sort of the apron of the flap which covers or attaches the bowels to the back part of the abdominal cavity. And she had these fatal wounds which caused her death. Although methamphetamine was present, that was not what caused her death."

On cross-examination, Dr. Von Guenthner noted that the effective and potentially toxic ranges listed in the report are mere standard ranges printed in every toxicology report. Actual effects of any given concentration would depend upon the given individual and circumstance: "So it all depends. You don't just take one finding and determine the cause of death. It's based upon the history, which is in this case the circumstances surrounding the death, the autopsy findings, and the toxicology results. And you take everything into account and you make that determination." Dr. Von Guenthner acknowledged that methamphetamine can cause tachycardia, or increased heart rate, which in turn might produce more profuse traumatic bleeding, but opined that it did not make

much of a difference if at all in this case, given the catastrophic severity of the injuries sustained.

At the end of the hearing, the circuit court granted the State's motion in limine no. 2, and its oral ruling was later memorialized in a written order which read, in essence:

### FINDINGS OF FACT

. . . .

6. Blood samples taken from the Victim at Wahiawa General Hospital prior to autopsy were sent to Central Valley Toxicology (CVT) in Clovis, California to be tested for the presence of drugs.

7. The Department of the Medical Examiner has a contract with CVT to perform these toxicology screens. It is common practice for the Department of the Medical Examiner to send blood samples to CVT for testing as part of the autopsy.

8. The Department of the Medical Examiner then considers the toxicology results, if any, in determining whether the presence of drugs in the decedent's system caused or in any way contributed to death in a given case.

9. In this case, the report from CVT indicated that the Victim's blood tested positive for the presence of methamphetamine and amphetamine.

10. In her expert opinion, Dr. Von Guenthner stated that the Victim died because she bled to death after being stabbed multiple times.

11. According to Dr. Von Guenthner, the Victim suffered fatal wounds to her kidney and renal blood vessels.

12. In her expert opinion, the presence of amphetamine and methamphetamine in the Victim's blood at the time of her death neither caused nor contributed in any way to her death.

13. The Defense has stated that it intends to raise the affirmative defense of insanity pursuant to HRS § 704–400 and the mitigation defense of extreme mental or emotional disturbance for which there is a reasonable

explanation pursuant to HRS § 707–702(2).

14. The Defense has further represented that it does not seek to raise the defenses of first aggressor or self-defense.

### CONCLUSIONS OF LAW

1. The presence of methamphetamine and amphetamine in the Victim's blood at the time of her death is irrelevant to any fact of consequence to the determination of the action. Hawaii Rules of Evidence (HRE) Rule 401 [ (1993) ].[7]

2. Even if the evidence were relevant, the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. HRE Rule 403 [ (1993) ].[8]

### ORDERS

ACCORDINGLY, IT IS HEREBY ORDERED that the State's motion in limine no. 2 is granted.

IT IS FURTHER ORDERED that any comment upon or reference to any toxicology tests done on [the decedent] is prohibited.

IT IS FURTHER ORDERED that any comment upon or reference to the presence of methamphetamine and amphetamine in [the decedent's] blood at the time of her death is prohibited.

(Footnotes supplied.)

### D.

In its notice of intent to use evidence no. 4, the State signaled its plan to proffer at trial morgue and autopsy photographs of the decedent. The State represented that the

photographs, though graphic, were "highly relevant to demonstrate the nature of the Victim's injuries, their location, their overall severity, and they corroborate the expert medical testimony of Dr. Von Guenthner."

Defendant responded with his motion in limine no. 2, in which he sought to preclude all photographs of the decedent's body, because

their probative value is substantially outweighed by the danger of unfair prejudice. [HRE] Rule 403. Further, admission of these photographs would constitute "needless presentation of cumulative evidence", since (1) there will be no question that Defendant caused the complainant's death, and (2) the medical examiner will testify as to the nature of complainant's injuries and cause of death. HRE [Rule] 403.

Defendant further reasoned that "the only issues here will be the insanity defense and mitigation due to extreme emotional or mental disturbance. Therefore, there is no need to resort to gruesome photographs to prove the *corpus delicti* [.]"

At the pretrial hearing on the photographs, the State proffered twelve photographs selected by Dr. Von Guenthner as "those photographs that would most accurately represent the injuries she observed and that would correlate her expert medical testimony at the time she testifies as to location of injuries, cause of death, mechanism of death, et cetera[.]" The circuit court decided:

The Court has reviewed the 12 photos and finds that the photos—and holds that the photos will be admissable [sic]. They are probative of issues in the case, will be of assistance to the doctor during the testimony, and viewing these photos, they will

---

**7.** Hawaii Rules of Evidence (HRE) Rule 401 (1993) provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 402 (1993) provides: "All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by these rules, or by other rules adopted by the

supreme court. Evidence which is not relevant is not admissible."

**8.** HRE Rule 403 (1993) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

be more probative than prejudicial and are not unduly prejudicial.

With regard to the photo number 1 which displays the breast and genital area of the deceased, Mr. [Prosecutor], if you could crop the lower portion of the photo. The Court does not see a need to show the—complete torso, and to the extent that you want to show the location of the wound on the torso, that can be done in relation to the breast area . . .

Accordingly, the circuit court filed a summary order denying Defendant's motion in limine no. 2, along with an order allowing the State to introduce into evidence the proffered photographs, which found and concluded essentially as follows:

### FINDINGS OF FACT

. . . .

4. [Dr. Von Guenthner], Chief Medical Examiner for the City and County of Honolulu, performed an autopsy on July 29, 2002.

5. Dr. Von Guenthner prepared a report that documented her observations, findings and conclusions. The report describes multiple stab and incised wounds.

6. Dr. Von Guenthner concluded that the Victim "died as a result of exsanguination due to injuries to the left renal blood vessels, left kidney and mesenteric blood vessels sustained when she was stabbed multiple times."

7. Morgue photographs were taken of the Victim.

8. The State anticipates calling Dr. Von Guenthner as a witness during its case-in-chief.

9. The State offered twelve proposed morgue photographs that it sought to enter into evidence during its case-in-chief.

10. The court reviewed these photographs in camera.

### CONCLUSIONS OF LAW

1. Photographs of the deceased's body that depict the nature of the deceased's injuries are admissible evidence regardless of whether or not the defense concedes the nature and manner in which the deceased was killed. *State v. Edwards*, 81 [Hawai'i] 293, [81 Hawai'i 293], 916 P.2d 703 (1996).

2. The twelve proposed photographs depict that nature and location of the injuries to the Victim and, therefore, are relevant. [HRE] Rule 401.

3. These photographs may be used to corroborate the testimony of Dr. Von Guenthner. *Edwards*, 81 [Hawai'i] at 298, 916 P.2d at 708.

4. These photographs are non-cumulative.

5. The probative value of these photographs is not substantially outweighed by the danger of unfair prejudice to the Defendant. HRE Rule 403.

### II. Discussion.

#### A.

■ On appeal, Defendant first contends the circuit court erred when it granted the State's motion in limine no. 2 and thereby excluded evidence of the toxicology report from trial. Defendant asserts that the "potentially toxic" level of methamphetamine in the decedent's blood was relevant to the cause of death and therefore admissible, and that its exclusion was an abuse of discretion and a violation of Defendant's constitutional rights to confrontation, due process and a jury trial.

For his argument on this point, Defendant first observes that Dr. Von Guenthner acknowledged taking the toxicology results into account in formulating her opinion on the cause of death. Hence, Defendant argues that the toxicology report, being a ground for Dr. Von Guenthner's opinion, was terrain ripe for his exploration at trial under HRE Rule 702.1(a) (1993):

A witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be cross-examined as to (1) the witness' qualifications, (2) the subject to which the wit-

ness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion.

(Subject heading omitted.) Citing HRE Rules 401 and 402, Defendant also argues that the toxicology report was generally relevant to the medical examiner's opinions and to the cause of death as a material element of the offense, and was thus admissible as a matter of evidentiary right, and as an unexplained matter of the several constitutional rights. Defendant's arguments are unavailing.

Assume, for the nonce and *arguendo,* that the toxicology report was indeed an HRE Rule 702.1(a) basis for Dr. Von Guenthner's opinions, albeit here on a par of significance with myriad and miscellaneous other matters noted by the medical examiner—such as, say, the temperature of the body at the time of the examination. Assume further that the toxicology report was otherwise generally relevant to the medical examiner's opinions and to the material element of causation. HRE Rules 401 & 402. Still, neither of these assumptions can obscure Dr. Von Guenthner's ultimate opinion of a mere hypothetical possibility the drugs played a part in the decedent's death, and that only with respect to the rate of death, and not its cause.

Given that Defendant inflicted injuries that evoked the *abattoir,* and given further that Defendant did not below and does not on appeal cite any evidence of the effect of the drugs other than his proffered cross-examination of the medical examiner, we can easily conclude the circuit court did not abuse its discretion[9] in deciding that the vaporous probative value of the evidence was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," HRE Rule 403, not to mention "considerations of undue delay[ or] waste of time[.]" *Id.*

### B.

■ For his next two points of error on appeal, Defendant contends the circuit court improperly instructed the jury on his EMED defense. The circuit court gave the jury EMED instructions that in pertinent part provided:

> If and only if you unanimously find that all the elements of Murder in the Second Degree have been proven by the prosecution beyond a reasonable doubt and you also unanimously find that the Defendant did not prove the affirmative defense of not guilty by reason of physical or mental disease, disorder or defect, then you must consider whether, at the time Defendant caused the death, he was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a *reasonable* person in the Defendant's situation under the circumstances of which the Defendant was aware or as the Defendant believed them to be.
>
> . . . .
>
> The question of the Defendant's self-control, or the lack of it, at the time of the offense, is a *significant* factor in deciding whether he was under the influence of an extreme mental or emotional disturbance.

(Emphases supplied.) Specifically, Defendant avers the court erred in including the words "reasonable" and "significant" where emphasized above, and in refusing his proposed additional instruction, which read:

> An extreme mental or emotional disturbance is the mental or emotional state of an individual who has an extreme mental or emotional reaction to an unusual and overwhelming stress as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.

■ With respect to the inclusion of the word "reasonable," Defendant points out, correctly, that it took the instruction out of its verbatim conformity with the Hawai'i

---

**9.** *See State v. Faufata,* 101 Hawai'i 256, 266, 66 P.3d 785, 795 (App.2003) ("the determination of the admissibility of relevant evidence under HRE [Rule] 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect" (citation and internal quotation marks omitted)).

Standard Jury Instructions Criminal (HAW-JIC), which, in HAWJIC Instr. 9.08 (2003), read the same as the circuit court instructed but without the word "reasonable" where the circuit court inserted it. However, while the HAWJIC "have been approved for publication, the Hawaiʻi Supreme Court has not approved the substance of any of the pattern instructions[,]" HAWJIC Introduction, and we are not bound by them. *State v. Nupeiset*, 90 Hawaiʻi 175, 181 n. 9, 977 P.2d 183, 189 n. 9 (App.1999). Defendant also points out, again correctly, that inclusion of the word "reasonable" deprived the instruction of its verbatim conformity with the governing statutory language. *See* HRS § 707-702(2) (1993). We observe, however, that an amendment effective after the offense was committed, 2003 Haw. Sess. L. Act 64, §§ 1 & 3 at 115–16 (Act effective May 19, 2003), made it clear that the hypothetical person with the correct perspective must be "a *reasonable* person in the circumstances as the defendant believed them to be[,]" HRS § 707-702(2) (Supp.2004) (emphasis supplied),[10] in consonance with the subjective/objective dichotomy recognized in a long line of supreme court cases predating the commission of the offense and the 2003 amendment. *See, e.g., State v. Sawyer*, 88 Hawaiʻi 325, 333, 966 P.2d 637, 645 (1998):

> We have stated that "the defendant must satisfy a subjective/objective test" in proffering a "reasonable explanation" in accordance with HRS § 707-702(2). *[State v.] Kaiama*, 81 Hawaiʻi 15,] 26, 911 P.2d [735,] 746 [ (1996) ] (citing *State v. Seguritan*, 70 Haw. 173, 174, 766 P.2d 128, 129 (1988)); *see also [State v.] Russo*, 69 Haw. 72,] 78, 734 P.2d [156,] 159 [ (1987) ]. First, in satisfying the subjective portion, the record must reflect the circumstances as the defendant believed them to be. Second, in satisfying the objective portion,

the record must support "a reasonable explanation or excuse for the actor's disturbance." *Kaiama*, .81 Hawaiʻi at 26, 911 P.2d at 746 (quoting *Russo*, 69 Haw. at 77–78, 734 P.2d at 159).

*See also Kaiama*, 81 Hawaiʻi at 26, 911 P.2d at 746:

> As such, HRS § 707-702(2) "does not authorize mitigation on the basis of individual abnormality without any measure of the defendant against an objective standard." [*Russo*, 69 Haw. at 78], 734 P.2d at 159.

We conclude the circuit court did not err by inserting the word "reasonable" where it did in the EMED jury instructions.

 As for the circuit court's inclusion of the word "significant" in the EMED instructions, Defendant argues that it constituted a "comment upon the evidence" prohibited by HRE Rule 1102 (1993).[11] We disagree. By inserting the word "significant" where it did, the circuit court was in fact fulfilling its duty under HRE Rule 1102, to "instruct the jury regarding the law applicable to the facts of the case[.]" *See State v. Perez*, 90 Hawaiʻi 65, 76, 976 P.2d 379, 390 (1999) (the trial court did not err in giving an identical EMED instruction); *State v. Haili*, 103 Hawaiʻi 89, 107–8, 79 P.3d 1263, 1281–82 (2003) (refusing to overrule *Perez* and thus concluding the trial court did not err in giving a virtually identical EMED instruction). In effect, the circuit court no more commented upon the evidence than did the legislature in defining the EMED defense in terms of an "extreme" mental or emotional disturbance. HRS § 707-702(2).

Defendant appears to recognize as much, for he notes the case law cited *supra* that supports the EMED instructions the circuit court gave in this case. Defendant argues, however, that even if the given EMED in-

10. HRS § 707-702(2) (Supp.2004) provides: "In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a *reasonable* person in the circumstances as the defendant believed them to be." (Emphasis supplied.)

11. HRE Rule 1102 (1993) provides: "The court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evidence. It shall also inform the jury that they are the exclusive judges of all questions of fact and the credibility of witnesses."

structions were correct, the circuit court should not have refused the paragraph he proffered, particularly

> in light of the evidence presented and arguments made by the defense that attempted to distinguish the different types of "self-control" at issue on the material elements of Murder in the Second Degree (proof of the "intentional or knowing" act required that caused the death of [the decedent] ), the "volitional capacity" on the [insanity] defense, and the "loss of self-control" in the EMED defense; *see State v. Haili, supra.,* 103 Hawai'i at 109–10, 79 P.3d at 1283–84 (2003).

Opening Brief at 34. Again, we disagree with Defendant.

The circuit court correctly instructed the jury on the elements of the offense, on the insanity defense and on the EMED defense, and Defendant's citation to the *Haili* dissent cannot conjure a specter of jury confusion out of the clarity of those instructions. We acknowledge that the paragraph proposed by Defendant was language taken straight from the cases, *see, e.g., Perez,* 90 Hawai'i at 73, 976 P.2d at 387, and we do not deny that a case may arise where it will prove apropos. But it has never been held to be mandatory, and we decline to require it here and today. After all, "The Hawai'i Legislature has not defined 'extreme mental or emotional disturbance.' Accordingly, the circuit courts need not define the term when instructing the jury; instead, the jury is to give the phrase its plain meaning." *Haili,* 103 Hawai'i at 108, 79 P.3d at 1282 (citations omitted).

We conclude, in sum, that the circuit court's instructions on the EMED defense were not, "when read and considered as a whole, . . . prejudicially insufficient, erroneous, inconsistent, or misleading." *Id.* at 101, 79 P.3d at 1275 (citation and internal quotation marks omitted).

### C.

▇ For his fourth and final point of error on appeal, Defendant avers the circuit court

erred in denying his motion in limine no. 2, thereby allowing the State to utilize at trial the twelve morgue and autopsy photographs it proffered pursuant to its notice of intent to use evidence no. 4. Defendant contends there was no need for the photographs, because he relied at trial only on the insanity and EMED defenses, and did not contest the cause of death. Defendant points out that there was alternative proof available in Dr. Von Guenthner's testimony and the anatomical diagrams she used on the stand. Defendant also claims that the photographs roused the jury to overmastering hostility. Finally, Defendant cites some Utah cases,[12] and thereon maintains that the circuit court should have required a showing of "unusual probative value" before it admitted the photographs into evidence. Defendant's arguments lack merit.

We decide that the *Edwards* case relied upon by the circuit court is not distinguishable as Defendant would have it, but controlling:

> Edwards's "concession," however, that the decedent was "murdered and brutalized in an animalistic manner" has no bearing upon the admission of the photographs at issue in this appeal. *See, e.g., Smallwood v. State,* 907 P.2d 217, 228 (Okl.Crim.App. 1995) ("Appellant's willingness to concede that there is no dispute over the identity of victim or the injuries sustained is not determinative of the photographs' admissibility.").

> "One of the most fundamental principles of the common law is that the occurrence of a crime must be proved before anyone can be convicted of the offense. The establishment of this *corpus delicti,* the body of the offense, is an essential element of the state's case." *State v. Dudoit,* 55 Haw. 1, 2, 514 P.2d 373, 374 (1973). "Pictures of the murder victim are always probative in establishing the *corpus delicti* of the crime." *Williamson v. State,* 812 P.2d 384, 400 (Okl.Crim.App.1991); *Territory v. Joaquin,* 39 Haw. 221, 230 (1952) ("Photographs of a homicide victim which depict

---

12. *State v. Lafferty,* 749 P.2d 1239 (Utah 1988); *State v. Cloud,* 722 P.2d 750 (Utah 1986); *State v.*

*Garcia,* 663 P.2d 60 (Utah 1983).

the fatal wounds or indicate the manner of death are admissible for purpose of identifying the victim; and this rule's observance is not affected by the fact that there is no actual dispute as to the identity of the deceased." (Citations omitted.)). Photographs of murder victims "can show the nature, extent and location of wounds, ... corroborate testimony of medical examiners and expert witnesses and depict the crime scene." *Smallwood*, 907 P.2d at 228 (citations omitted).

In this case, for instance, the photographs of the ligature marks on the decedent's wrists and ankles corroborate the coroner's testimony that the decedent was bound by her assailant, rendering those photographs probative of the kidnapping charge. Similarly, and for obvious reasons, the photographs of the injuries to decedent's face, sexual parts, and her entire body are probative of the charges of murder, robbery, and sexual assault. Thus, notwithstanding Edwards's position that the photographs lacked probative value because "[t]he only real issue at trial was the identity of the culprit," we hold that the photographs were relevant and probative.

The question then narrows to whether "the probative value [of the photographs was] substantially outweighed by the danger of *unfair* prejudice." HRE [Rule] 403 (emphasis added). The commentary to HRE [Rule] 403 explains that " '[u]nfair prejudice' ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." We therefore examine each of the photographs admitted into evidence by the trial court.

*Edwards*, 81 Hawai'i at 298–99, 916 P.2d at 708–9 (ellipses and some brackets in the original).

We have reviewed the photographs in the record, and it is our opinion that their probative value was not substantially outweighed by the danger of unfair prejudice. HRE Rule 403; *Edwards*, 81 Hawai'i at 298, 916 P.2d at 708. Recognizing *Edwards'* adoption of HRE Rule 403 as an all-encompassing balancing test, we decline Defendant's exhortation to engraft the purported Utah requirement of "unusual probative value." We conclude, finally, that in admitting the photographs into evidence, the circuit court did not abuse its discretion. *Edwards*, 81 Hawai'i at 297, 916 P.2d at 707 ("admission or rejection of photographs is a matter within the discretion of the trial court").

### III. Conclusion.

Accordingly, the January 26, 2004 judgment of the circuit court is affirmed. In light of our affirmation, the State's cross-appeal of the circuit court's August 12, 2003 order denying the State's July 30, 2003 motion to preclude argument and jury instruction on the EMED defense, is moot.