177 P.3d 928

STATE of Hawai'i, Respondent/Plaintiff–Appellee

v.

Keith Daniels GOMES, Petitioner/Defendant–Appellant.

No. 27906.

Supreme Court of Hawai'i.

Feb. 20, 2008.

Phyllis J. Hironaka, Deputy Public Defender, for petitioner/defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, for respondent/plaintiff-appellee.

MOON, C.J., LEVINSON, ACOBA, and DUFFY, JJ.; and NAKAYAMA, Dissenting.

Opinion of the Court by ACOBA, J.

Petitioner/Defendant–Appellant Keith Daniels Gomes (Petitioner) filed an application for writ of certiorari on October 31, 2007, seeking review of the judgment of the Intermediate Court of Appeals (the ICA) filed on August 2, 2007, pursuant to its Summary Disposition Order (SDO) filed on July 11, 2007,[1] affirming the March 28, 2006 judgment of the first circuit court[2] (the court) in Cr. No. 05–1–1181,[3] convicting Petitioner of bribery of a Witness, Hawai'i Revised Statutes (HRS) § 710–1070 (1993), and sentencing him to five years' imprisonment.[4] We hold that the ICA erred in affirming the court's denial of Petitioner's motions for judgment of acquittal of the charge of bribery under HRS § 710–1070(1)(b) because even in viewing the evidence in the light most favorable to the prosecution, substantial evidence did not exist to support the jury's finding that Petitioner offered money to a potential witness *with the intent to induce her to avoid service of process.*

## I.

HRS § 710–1070 states in relevant part, as follows:

**Bribery of or by a witness.** (1) A person commits the offense of bribing a witness if he confers, or offers or agrees to confer, directly or indirectly, any benefit upon a witness or a person he believes is about to be called as a witness in any official proceeding *with intent to:*

(a) Influence the testimony of that person;

(b) *Induce that person to avoid legal process summoning him to testify; or*

(c) Induce that person to absent himself from an official proceeding to which he has been legally summoned.

(Emphases added.) The indictment in this case charged a violation of HRS § 710–1070(1)(b) and read as follows:

The Grand Jury Charges:

On or about the 15th day of March, 2005, to and including the 17th day of April, 2005, in the City and County of Honolulu, State of Hawaii, [Petitioner], believing Leah Zook [ (Zook) ] was to be called as a witness in an official proceeding, did confer, offer, or agree to confer, directly or indirectly, a benefit upon said [Zook], *with intent to induce [Zook] to avoid legal process summoning her to testify, thereby committing the offense of Bribery of a Witness in violation of Section 710–1070(1)(b) of the [HRS].*

(Emphasis added.)

### A. :

The relevant facts are taken from the record.[5] As best as can be reconstructed, the sequence of events as reiterated in the Application and supplemented by the appellate briefs follow.

[Zook] moved to Hawaii from Minnesota in December 1999 and moved back to

---

1. The SDO was issued by Chief Judge Mark E. Recktenwald and Associate Judges Corinne K.A. Watanabe and Daniel R. Foley.

2. The Honorable Steven S. Alm presided.

3. The ICA's judgment also vacated the court's March 31, 2006 amended judgment in Cr. No. 05–1–0661, that convicted Petitioner of two counts of Assault in the Second Degree, HRS § 707–711(1)(a) and (1)(d) (1993), and remanded Cr. No. 05–1–0661 to the court for entry of a new judgment consistent with the SDO. Petitioner's Application does not contest this part of the judgment.

4. Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) did not file a memorandum in opposition.

5. Facts in excerpts referred to or quoted from the Application and from the appellate briefs have been verified in the record.

Minnesota in June 2005. In February 2005, she was living in the bottom story of a Lanikai home overlooking Mokolea Drive with her young son and her close friend, Dana Fannes ("Fannes"). *On February 28, 2005, Zook and Fannes witnessed a fight on the street below her lanai ....* [6]

Soon after the incident, Zook told her good friend, Kathy Schulte ("Schulte"), about the fight she had witnessed.

(Emphases added.) According to Respondent, Schulte testified that Zook told her about the incident "within [approximately] two weeks[.]" (Brackets in original.) Schulte also testified that on occasion, Zook "would tell me how she was involved and how she was a witness in a trial" arising from the incident she had witnessed. As Petitioner relates from the record,

Schulte confirmed that within a few days up to two weeks after the incident, her good friend Zook told her about the fight she had witnessed. Zook also periodically updated Schulte on her status as a witness in that case. *Schulte learned from her then-boyfriend, [William Nolta (Nolta)], that his good friend, [Petitioner], and [co-defendant Lance Larsen AhQuin (AhQuin)] were defendants in a February 28 assault case.*

(Emphasis added.) AhQuin was arrested on February 28, 2005. Petitioner testified on cross-examination that he knew AhQuin had been arrested but claimed that he did not know "the degrees [of assault] or what they meant" or that AhQuin "was supposed to go to court soon after he was arrested[.]"

The Application recounts from the record that "Zook was subpoenaed to testify at a March 31, 2005 preliminary hearing on the [assault] case." It is not clear from the Application, the briefs, or the Record on Appeal when this subpoena was issued or served. However, Zook did not actually testify on March 31, 2005. Apparently, according to Respondent, Zook was not required to appear on March 31, 2005 because the preliminary hearing was "continued from March 31st to a month down the road."

**6.** The proceedings arising out of the fight that Zook and Fannes witnessed are hereinafter re-

The record verifies the following, as the Application states:

Near the end of March 2005, Schulte was with Nolta at [T]he O Lounge when they ran into [Petitioner]. Out of curiosity, *Schulte struck up a conversation with [Petitioner] to find out whether the incident for which Zook was now a trial witness was the same assault with which [Petitioner] was charged. Schulte testified that when she and [Petitioner] concluded that it was:*

[Petitioner] ... asked [Schulte] to tell [Zook] not to show up to court and testify .... He was very adamant on asking me if I could please tell her not to come to court, that possibly if she didn't show up that the trial would be thrown out or maybe the charges against him would be dropped.

When Schulte expressed her doubt that Zook could be convinced not to appear in court, Schulte described [Petitioner's] reaction: "He didn't really respond. *He was just, you know, if you could tell her not to show up ....* " On the drive home, Schulte reviewed with Nolta the discussion she had had with [Petitioner].

(Emphases added.) Nolta confirmed that he encountered Petitioner "at [T]he O Lounge sometime in March, *mid-March or sometime in April* " of 2005 on "either a Friday or a Saturday." (Emphasis added.) Nolta claimed that before this encounter, Petitioner had not mentioned being involved in a fight in Lanikai.

According to Nolta, he introduced Schulte to Petitioner and as "a little icebreaker[,]" Schulte mentioned that her friend had "witnessed something in Lanikai[.]" Nolta related that Schulte and Petitioner "put two and two together" and determined that Zook had seen the fight in which Petitioner was involved. Nolta testified that Schulte did not tell him that Petitioner had asked her to do something for him. However, he did state that as they were leaving The O Lounge, he

ferred to as "the assault case."

observed Schulte tell Petitioner, "I'll take care of it," and pat him on the back.

According to the record, as stated by Petitioner,

[u]pon awaking at Nolta's house the next morning, Nolta told Schulte that his phone showed a few missed calls from [Petitioner]. *Later that morning, Nolta answered a call from [Petitioner] who wanted to know if Schulte had yet talked to Zook. When Nolta said that she had not, [Petitioner] insistently told Nolta to tell Schulte to talk to Zook, tell Zook not to show up, and that [Petitioner] would give Zook money.* About three to four hours later, [Petitioner] again called about the same subject.

(Emphasis added.) Nolta testified that he recalled telling the Prosecutor's Office that when he finally spoke to Petitioner on the phone, Petitioner instructed him to ask Zook "if maybe she would take some money" in exchange "[f]or her not to show up...." Nolta testified that he did not accompany Schulte to Zook's house that day (*i.e.,* the day after encountering Petitioner at The O Lounge), but rather "the day after...." Regarding the visit, the record indicates, as Petitioner states, that

[a]t about 4:00 or 5:00 that afternoon, [7] Schulte went to Zook's house to convey [Petitioner's] message. Nolta · and Schulte's nephew accompanied Schulte, but remained downstairs in the truck. Zook, Fannes, and Zook's son were home. Schulte also testified:

I had told [Zook] that I encountered [Petitioner] the night before at The O Lounge and that I had asked him whether the involvement was the same scenario and he said yes, *and that he had told me to please tell her not to show up at court, and that the reason why I was there was to let her know [that], and that he had kept calling and asking if I*

had seen her and come and talk to her and tell her not to show up, that he would give her money not to come to court and testify against him.

(Emphases added.) According to Respondent, Petitioner elicited testimony from Schulte that Zook asked "how much" money the offer was for, to which Schulte replied that Petitioner "didn't mention an amount." Schulte also answered in the negative when Petitioner's counsel asked her whether there was any discussion regarding "logistics about testifying or not testifying[.]"

The record sets forth that thereafter, as Petitioner relates,

Zook refused the offer, telling Schulte that she didn't want an arrest warrant for failing to appear, and that she wouldn't accept money because it was a bribe. When Schulte returned to the truck, she related her discussion with Zook to Nolta. *Nolta later told Schulte that he had relayed the message to [Petitioner] either later that evening or the next day.*

Nolta testified that he told the prosecutor and the prosecutor's investigator that "*[Petitioner had] called ... and asked [Nolta] to ask [Schulte] to ask [Zook] if [Zook] would consider taking money*" in exchange "*for [Zook] not to show up[.]*" Nolta also told the prosecutor and the prosecutor's investigator that:

"*the whole response [from Zook] was that she was subpoenaed. I don't know how specifically subpoenaed [,] federally[,] locally, whatever, [8] that she has to testify or else she would receive a bench warrant I think was said in the State of Hawaii which [ ( ]inaudible[ ) ] she wouldn't be allowed to return.*"

(Emphases added.)

Petitioner and his co-defendant, AhQuin were indicted for two counts of Assault in the Second Degree on April 5, 2005.[9] According

7. There is a discrepancy of a day between the Application's statement and Nolta's testimony.

8. There is no indication in the record as to what this subpoena was for.

9. The indictment read as follows:
The Grand Jury charges:

*Count I:* On or about the 28th day of February, 2005, in the City and County of Honolulu, State of Hawaii, [AhQuin] ... and [Petitioner] did intentionally or knowingly cause substantial bodily injury to Fonokalafi Misi, thereby committing the offense of Assault ·in the Second Degree, in violation of section 707–711(1)(a) of the [HRS].

to Petitioner, he was not aware that he might be in any trouble related to the February 28, 2005 incident until early April. On redirect examination, Petitioner answered in the affirmative when asked, "Unlike your brother, who was charged relatively quickly, you weren't actually charged until early April; is that [correct]?"

According to the record, and reiterated in the Application, Zook testified about a conversation she had with Schulte in mid-April regarding an offer of money in exchange for Zook refraining from testifying.

> In mid-April, Schulte approached Zook and asked that she not return to Hawaii to testify in that case. Schulte made this request during a short (i.e., 20–30 minute) visit to Zook's house on a weekend when Zook, her child, and Fannes were home. Schulte told Zook that her [ (Schulte's) ] ex-boyfriend, [Nolta] knew the defendants. Zook testified that[ ] "[Schulte] told me that these gentlemen told [Nolta] to tell [Schulte] to tell [Zook and Fannes] if we didn't testify we would be given money." Zook also clarified that ["t]he offer was money for both my roommate [Fannes] and I[sic] ... [i]n exchange for us not testifying in this trial."

(Emphases and some brackets added.) (Internal citations omitted.) It appears from the record that the two accounts concerning Schulte's conversation with Zook conveying Petitioner's alleged offer pertain to the same occasion although Schulte places it at the end of March and Zook places it at mid-April. In other words, Schulte and Zook only discussed the alleged offer on one occasion, either in late March or in mid-April.

Thus, it seems under both accounts that the subpoena summoning Zook to testify at a March 31, 2005 preliminary hearing for the assault case had been served before the entreaty from Petitioner was allegedly conveyed by Schulte. *See supra* at 221, 177 P.3d at 931. It is not clear from the record or the briefs whether Zook had been sum-

moned to appear at any other court proceedings such as the trial on the assault case and if she had, on what date the summons was issued or served.

### B.

At trial, Petitioner testified on his own behalf that when he spoke to Schulte at The O Lounge, he had not yet been charged in the assault case, "had not reviewed any reports[,]" and "did not know whether there were any witnesses to the incident." Additionally, he denied asking Schulte to "tell her friend don't testify." He also said that on the day after seeing Schulte and Nolta at The O Lounge, he left only one message for Nolta, which simply asking Nolta if Zook "could tell them ... what she had seen." Petitioner denied that in the message he told Nolta to tell Zook not to testify or that he would give Zook money.

At some unspecified time, Zook reported the alleged offer to the authorities. Officer Neil Han, who was working the assault case, interviewed Zook on April 24, 2005 or May 2, 2005 regarding the possible bribery. After Officer Han's interview with Zook, she testified before the Grand Jury regarding the alleged bribery offer from Petitioner. On June 8, 2005, Respondent filed an indictment against Petitioner charging him with the offense of Bribery of a Witness in violation of HRS § 710–1070(1)(b) (the bribery case).

### II.

The assault and bribery cases were consolidated and went to trial on December 13–22, 2005. In its Opening Statement, Respondent described the alleged conversation between Schulte and Petitioner thusly:

> The bottom line is that sometime at the end of March 2005 [Petitioner] ... and [ Schulte] ... [and Nolta go] to [T]he O [Lounge] ... one evening, probably a Friday.... [T]hey got together and [Schulte] basically asked [Petitioner, "H]ey, is this the same thing what I heard [from] my

---

*Count II:* On or about the 28th day of February, 2005, in the City and County of Honolulu, State of Hawaii, [AhQuin] ... and [Petitioner] did intentionally or knowingly cause bodily injury to Fonokalafi Misi, with a

dangerous instrument, thereby committing the offense of Assault in the Second Degree, in violation of Section 707–711(1)(d) of the [HRS].

friend?["] And, it turns out that it was confirmed that [Schulte's] information from [Zook] was the same incident that [Nolta] got from [Petitioner]. And, [Petitioner] tells [Schulte, "H]ey, tell your friend [Zook], you know, *if she don't [sic] come back and testify, it might be good for me,["] something like that.* So, [Schulte] says[, "N]o, I don't think [Zook] would do anything like that. *You know, she's ordered to come testify, she's coming back.["] At that time, of course, [Schulte] knew that [Zook] had gone back to Minnesotta [sic].* [10] [And Petitioner said, "]Go ahead, try. Help me out[,]" words to that effect.

(Emphases added.) Also, in its Opening Statement, Respondent said the conversation between Schulte and Zook was, "So, at some point ... [Nolta] drove [Schulte] to [Zook's] residence ... and put it to her that ... ['H]ey, [Zook], there's some money involved if you don't come back.['] That's basically what [Petitioner said.]"

■ According to Petitioner, during trial, [Petitioner's] defense counsel thrice moved for judgment of acquittal of Bribery, arguing that the evidence presented was insufficient to make out a violation of HRS § 710–1070(1)(b), as charged. After thrice denying [Petitioner's] motions, the [court] submitted the Bribery case to the jury, who [sic] then convicted [Petitioner] as charged.

Petitioner first moved for a judgment of acquittal at the end of Opening Statements, arguing that "[Respondent] adduced evidence that there was intent to adduce—process by an assertion by [Respondent] that there was not to show up which is different actually [from the HRS § 710–1070(1)(c) ] charge that [Respondent] raised versus [a HRS § 710–1070(1)(b) ] charge which is process somebody to receive." The court ruled, "Okay, I

heard [Respondent] talk about force. So, the motion is denied as far as—basis the motion is denied on that basis[,] too." [11]

When Petitioner made his second motion for judgment of acquittal at the close of Respondent's case in chief, the court ruled that

because of the way the evidence has come out, we've had several statements ... that were made both to [Schulte] allegedly by [Petitioner] as well as to [Nolta] by [Petitioner]. And [Respondent] believes that based on all of those different statements, that based on the standard we have here [Respondent] has proven [the bribery charge]. *I believe there was even testimony by the witness that in—words to the effect of not to come back or not coming back. And the charge here under [HRS § 710–1070(1)(b) ] is induce the person to avoid legal process summoning him to testify. It's certainly a reasonable inference if a person is not coming back and there had been discussions about subpoenas and otherwise, that in looking at this in the light most favorable to [Respondent] ... I don't think the motion for judgment of acquittal is justified.*"

(Emphasis added.)

Finally, Petitioner moved for a judgment of acquittal at the close of his case, incorporating "by reference the arguments ... previously made." The court ruled, "All right. And the [c]ourt will deny it at this time, as well."

### III.

Petitioner presents the following question in his Application.

Whether the ICA gravely erred, in violation of [Petitioner's] due process rights to be convicted *only* upon proof of every material element beyond a reasonable doubt,

---

10. This portion of Respondent's Opening Statement is inaccurate. The evidence shows that Zook did not leave Hawai'i until June 2005. In fact, Respondent's Answering Brief avers that "before [Zook] left Hawai'i *in June of 2005,* she was 'approached [in April] by [Schulte] asking [her] not to come back to testify in this case.'" (Some brackets in original.) (Emphasis added.)

11. The transcript of this portion of the proceedings is extremely garbled, and the bases for both the motion and the court's denial are not discernible to any degree of certainty. However, because Petitioner put on evidence after moving for a judgment of acquittal at the end of Respondent's case, he waived any error in the denial of his first two motions for judgment of acquittal. *See State v. Pudiquet,* 82 Hawai'i 419, 423, 922 P.2d 1032, 1036 (App.1996) (citations omitted).

by affirming the [court's] denial of [Petitioner's] motions for judgment of acquittal of Bribery *despite a complete lack of evidence that [Petitioner] had violated HRS § 710–1070(1)(b), the subsection under which he was indicted.*

(First emphasis in original and second emphasis added.) This question seems to raise two issues, namely, (1) whether the court erred in denying Petitioner's motions for judgment of acquittal and (2) whether there was sufficient evidence for the jury to find Petitioner guilty under HRS § 710–1070(1)(b).

## IV.

As set forth above, HRS § 710–1070 recognizes three distinct culpable acts with respect to a witness's testimony.[12] Petitioner argues that Respondent must prove "all of the elements of the crime charged ... beyond a reasonable doubt." (Quoting *State v. Cuevas*, 53 Haw. 110, 115, 488 P.2d 322, 325 (1971).) HRS § 702–205 (1993) provides that "[t]he elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct as: (a) [a]re specified by the definition of the offense, and (b) [n]egative a defense. . . ."

The court's bribery instruction read as follows:

There are three material elements of ... Bribery of a Witness, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That, on or about March 15, 2005, to and including the 17th day of April, 2005, ... [Petitioner] conferred, offered, agreed to confer, directly or

indirectly, any benefit upon [Zook] [ (conduct) ]; and

2. That [Zook] was a person that [Petitioner] believed was about to be called as a witness in any official proceeding [ (attendant circumstances) ]; and

3. That [Petitioner] did so with *the intent to induce [Zook] to avoid legal process summoning her to testify* [ (results of conduct) ].

(Emphases omitted and emphasis added.) (Some brackets in original.) The court also instructed the jury that "legal process means a subpoena."

Petitioner maintains that none of his purported statements "evidenced an intent to induce Zook to avoid *legal process* [ ] [under HRS § 710–1070(1)(b) ] (rather than appearance at court to testify) [under HRS § 710–1070(1)(c) ]." (Emphasis in original.) He asserts that "[t]he testimony by witnesses Zook, Schulte, and Nolta ... is completely devoid of evidence of the third element: that [Petitioner] acted with the intent to induce Zook to avoid the legal process (*i.e.,* evade service of a subpoena)."

## V.

The ICA held with respect to the question raised in the Application that, "[v]iewing the evidence in the light most favorable to [Respondent], there was sufficient evidence that [Petitioner] offered Zook money with the intent to induce her to avoid legal process summoning her to testify." SDO at *1. As noted previously, Petitioner argues that the ICA's conclusion constituted grave error and states, further, that "[n]o rationale elucidates the terse conclusions" of the ICA that the court did not err in denying Petitioner's motions for judgment of acquittal and that there

---

12. We observe that the commentary to HRS § 710–1070 states as follows:

It is apparent that substantial interference with any part of the process whereby a witness is called to testify in an official proceeding is to be condemned. And since each part of the process is of unique importance in assuring the availability and integrity of the witness, it follows that the sanction ought to be the same regardless of which part of this process is obstructed or perverted. *Therefore, it is made an offense to interfere,* by means of conferring or receiving a benefit *with either [1] testimony,*

*[2] service of process, or [3] appearance at the proceeding.*

Note that the person whom the actor attempts to induce need not actually be a witness, but may merely be one whom the actor believes is about to be called as a witness. This provision is to avoid confusion as to when an individual actually becomes a witness, thus foreclosing specious defenses and emphasizing that the harm inheres in the attempt to interfere with the course of the official proceeding. Commentary on HRS § 710–1070 (1993) (emphases added).

was "sufficient evidence" to support Petitioner's conviction.

## VI.

 As noted by Petitioner, appellate courts view the evidence "in the strongest light for the prosecution" to determine "whether there was substantial evidence to support the conclusion of the trier of fact." *State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (internal quotation marks and citations omitted). "Substantial evidence" is "evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (internal quotation marks and citation omitted).[13]

## VII.

 Several of the terms used in the statute and corresponding jury instruction[14] are defined by statute. "Benefit" is defined as "gain or advantage, or anything regarded by the beneficiary as gain or advantage, including benefit to any other person or entity in whose welfare the beneficiary is interested[.]" HRS § 710–1000(2) (1993). "Official proceeding" is defined as "a proceeding heard or which may be heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner, notary or other person taking testimony or deposition in connection with any such proceeding[.]" HRS § 710–1000(12). Finally, "testimony" is defined as "oral or written statements, documents, or any other material that may be offered by a witness in an official proceeding." HRS § 710–1000(17).

 Several other terms require definition for a proper understanding of the proof required under HRS § 710–1070(1)(b). Witness is defined as (1) "[o]ne who sees, knows, or vouches for something" or (2) "[o]ne who gives testimony under oath or affirmation [ (a) ] in person, [ (b) ] by oral or written deposition, or [ (c) ] by affidavit." *Black's Law Dictionary* 1633 (8th ed.2004). "Service" is defined as "[t]he formal delivery of a

---

13. The appellate courts, in review of a denial of a motion for judgment of acquittal, consider "whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Pudiquet*, 82 Hawai'i at 423, 922 P.2d at 1036 (citations and internal quotation marks omitted). As stated in *Pudiquet*,

> HRPP Rule 29(a) provides in relevant part that a "court on motion of defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses alleged in the charge after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." A motion for judgment of acquittal, therefore, "tests the sufficiency of the evidence" with regards to each element of the charged offense. *[State v.] Alston*, 75 Haw. [517,] 527, 865 P.2d [157,] 163 [ (1994) ]. When an appellate court reviews the sufficiency of the evidence, it examines
>> whether there was substantial evidence to support the conclusion of the trier of fact.... Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.
> *[State v.] Pone*, 78 Hawai'i [262,] 265, 892 P.2d [455,] 458 [ (1995) ] (citations and internal quotations omitted).

*Id.*

The Application and the briefs argue in terms of the substantial·evidence standard. For the reasons set forth *infra*, it was error to have denied the motion for judgment of acquittal at the end of all the evidence. Because there was insufficient evidence to support the verdict, further analysis of the acquittal denial is unnecessary.

14. The Hawai'i Standard Jury Instructions states that to prove HRS § 710–1070(1)(b) beyond a reasonable doubt, the prosecution must establish that (1) the defendant conferred, offered, or agreed to confer, directly or indirectly, a benefit upon another person; and (2) the other person was a witness or a person that the defendant believed was about to be called as a witness in any official proceeding; and (3) the defendant did so with the intent to induce the person to avoid legal process summoning him to testify.

It may be noted that "while the [Hawai'i Standard Jury Instructions Criminal (HAWJIC) ] 'have been approved for publication, the Hawai'i Supreme Court has not approved the substance of any of the pattern instructions[,]' HAWJIC Introduction, and [the courts] are not bound by them." *State v. Calaro*, 107 Hawai'i 452, 463, 114 P.3d 958, 969 (App.2005) (quoting *State v. Nupeiset*, 90 Hawai'i 175, 181 n. 9, 977 P.2d 183, 189 n. 9 (App.1999)).

writ, summons, or other legal process" and is "[a]lso termed *service of process.*" *Id.* at 1399 (emphasis in original). Relatedly, "process" is defined as "[a] summons or writ, [especially] to appear or respond in court[.]" *Id.* at 1242.

Applying these definitions to the jury instruction, Respondent was required to prove that, first, Petitioner conferred, offered, or agreed to confer, directly or indirectly, something that Zook would consider a gain or advantage to herself or to some other person or entity in whose well-being she was interested. Second, that Petitioner believed Zook was going to be called to give testimony under oath or affirmation in person, by oral or written deposition, or by affidavit in a proceeding heard by any governmental branch authorized to receive evidence under oath. Finally, that Petitioner acted with the intent to induce Zook to avoid delivery of a writ or summons calling her to appear or respond in court.

### VIII.

Petitioner does not dispute that there is substantial evidence that Respondent proved Petitioner offered to confer a benefit on Zook, a person Petitioner believed was a witness or about to be called as a witness in an official proceeding. As mentioned before, in his Application, Petitioner focuses on the lack of substantial evidence that he acted specifically with the intent to *"[i]nduce that person to avoid legal process summoning him to testify* [,]" as required under HRS § 710–1070(1)(b). (Emphasis in original.)

### IX.

In its Answering Brief, Respondent maintains that there was sufficient evidence to support the jury's conclusion that Petitioner "intended to induce Zook to avoid legal process summoning her to testify" because Respondent had shown that: (1) Schulte asked Zook in April "not to come back to testify," (2) Petitioner was the individual who made the offer, and (3) "[Petitioner] believed that without Zook as a witness [Respondent] would likely be unable to prosecute him."

According to Respondent, Petitioner's intent could be "inferred from the evidence of the statements he made to the various witnesses[ ] in conjunction with the circumstances surrounding his making of the statements." (Citing *State v. Bui,* 104 Hawai'i 462, 467, 92 P.3d 471, 476 (2004). (Citations omitted.)) Respondent maintains that "[t]he use of such evidence and inferences rationally drawn therefrom is inevitable because direct evidence of a defendant's state of mind is rarely available." (Citing *Pudiquet,* 82 Hawai'i at 425, 922 P.2d at 1038. (Citations omitted.))

### X.

As a threshold matter, it must be determined whether Respondent could prove Petitioner's intent by evidence other than Petitioner's statements. Our courts have recognized that, although "a defendant's state of mind can rarely be proved by direct evidence," *Pudiquet,* 82 Hawai'i at 425, 922 P.2d at 1038, "proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient. . . . Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances." *Bui,* 104 Hawai'i at 467, 92 P.3d at 476 (ellipses points in original) (quoting *State v. Batson,* 73 Haw. 236, 254, 831 P.2d 924, 934 (1992) (quoting *State v. Sadino,* 64 Haw. 427, 430, 642 P.2d 534, 536–37 (1982)) (brackets omitted)); *see also State v. Yabusaki,* 58 Haw. 404, 409, 570 P.2d 844, 847 (1977) (explaining that intent may be proved by circumstantial evidence and it may be shown by a reasonable inference arising from the circumstances surrounding the act).

The decision in *Pudiquet* is particularly instructive on this issue. In that case, the defendant was charged with Intimidation of a Witness pursuant to HRS § 710–1071(1)(a) (1993). The elements of Intimidation of a Witness are similar to the elements of Bribery of a Witness. HRS § 710–1071(1)(a) prohibits (1) the use of "force upon or a threat, (2) directed to a witness or a person [the defendant] believes is about to be called as a witness in any official proceeding, (3)

with the intent to influence the testimony of that witness or person." 82 Hawai'i at 423, 922 P.2d at 1036 (citing HRS § 710–1071(1)(a)).

On appeal, the defendant contended that the prosecution had not proved any of these elements beyond a reasonable doubt. *Id.* at 424, 922 P.2d at 1037. With respect to the intent component, the defendant "maintain[ed] that the verbal exchange between him and [the complainant was] not sufficient to show that he intended to influence [the complainant's] testimony." *Id.* at 425, 922 P.2d at 1038. During the relevant exchange, the defendant had allegedly yelled at the complainant, "[Y]ou fucker, I'm going to get you," after being informed that the complainant had filed a police report alleging that the defendant had stolen merchandise from the complainant's store. *Id.* at 422, 922 P.2d at 1035. The ICA held that the defendant's statements, the surrounding circumstances, and the inferences that could be drawn therefrom provided "sufficient evidence to support a conclusion by a reasonable person that" the defendant intended to influence the complainant's testimony in the theft case. *Id.* at 425, 922 P.2d at 1038.

Based on the foregoing, it is clear that Respondent could use evidence other than, or in addition to, Petitioner's statements to prove his intent to induce Zook to avoid service of process. Respondent was not required, as Petitioner would have it, to introduce explicit statements made by the Petitioner "ask[ing] Zook to refuse to receive any subpoena or make herself scarce in order to evade service of any subpoena." Rather, Petitioner's state of mind could be proved by circumstantial as well as direct evidence.

## XI.

■ However, viewing the evidence in the light most favorable to Respondent, there was not substantial evidence to support the jury's finding that Petitioner offered Zook money with the intent to induce her to *avoid service of process.* HRS § 710–1070(1)(b) requires proof that Petitioner intended to induce Zook to avoid service of process. In contrast, HRS § 710–1070(1)(c) requires proof that Petitioner intended to induce Zook

to absent herself from a proceeding to which she had been summoned.

The trier of fact could reasonably conclude that Petitioner knew Zook was a witness or could be called as a witness in the assault case because Schulte told him Zook had seen the February 28, 2005 incident and Petitioner knew that AhQuin had been arrested for his participation in that incident. The testimony was that Petitioner offered Zook money to "not show up" or "not show up and testify." The plain meaning of the statements attributed to Petitioner is that Zook should not appear in court to testify about what she witnessed on February 28, 2005. Hence, based on the evidence, the jury could reasonably infer that Petitioner sought to avoid punishment in the assault case by preventing the presentation of eye-witness testimony.

■ However, the leap from asking a potential witness to "not show up" or to "not show up and testify" to the conclusion that a defendant thereby intended to induce that witness to avoid service of process is untenable in light of the structure of HRS § 710–1070. "[T]he starting point for interpreting a statute is the language of the statute itself." *State v. Moniz*, 69 Haw. 370, 374, 742 P.2d 373, 376 (1987) (citation omitted). Moreover, "where the language of the law in question is plain and unambiguous," courts are obligated to "give effect to the law according to its plain and obvious meaning." *Mikelson v. United Servs. Auto. Ass'n*, 108 Hawai'i 358, 360, 120 P.3d 257, 259 (2005) (citation omitted). Here, the language of HRS § 710–1070(1)(b) is plain and unambiguous. Neither party argues to the contrary.

Under a plain reading of the statute, substantial evidence was necessary to support Petitioner's conviction for inducing a witness or a person Petitioner believed was to be called as a witness "to avoid legal process summoning him to testify[.]" HRS § 710–1070(1)(b). In that regard there was insufficient evidence to lead a person of reasonable caution to reach the particular conclusion that Petitioner intended to induce Zook to avoid service of process under HRS § 710–1070(1)(b).

There is a paucity of facts regarding evidence of an intent to "induce ... avoid[ing] *legal process* [, *i.e.,* a subpoena,] summoning [the witness] to testify." *Id.* There is no evidence of what particular subpoena was the subject of the indictment. There is no evidence of when any relevant particular subpoena was issued or served. No subpoena ordering Zook to appear at any official proceeding is on the court's exhibit list. The evidence fails to indicate what subpoena or subpoenas were the alleged subject of Petitioner's culpable state of mind. There is no evidence of what "official proceeding" was the subject of the bribery indictment or of Petitioner's state of mind.[15] The record on appeal does not contain any subpoena ordering Zook to testify at any official proceeding.

Based on the testimony and sequence of events, there is testimony that a subpoena for a preliminary hearing to be conducted on March 31, 2005 had been served, prior to the alleged offer by Petitioner. That hearing was apparently postponed for a month. The subpoena itself is not in evidence. Petitioner's alleged monetary offer was based on Zook not appearing to testify, rather than on her avoiding the service of a subpoena.

The Application does state that "[i]n mid-April, Schulte approached Zook *and asked that she not return to Hawai'i to testify* in [the assault] case." (Emphasis added.) The testimony to which the Application cites, elicited during Respondent's direct examination of Zook, is as follows:

Q. [Respondent]. [B]efore you left the islands here in June [2005] and sometime after you made your initial reports to the police regarding this incident [ (the alleged assault) ], *were you approached by someone asking you not to come back to testify in [the assault] case?*

A. [Zook]. *Yes.*

Q. You have an idea when this may have happened?

A. It happened in April.

Q. Any part of April that you recall?

A. Could have been [the] middle of April.

Q. And who was this person who approached you?

A. My friend[,] [Schulte].

Q. And, what did she tell you?

. . . .

A. She told me that her ex-boyfriend[, Nolta,] knew the people I was planning on testifying against.... [Schulte] told me that these gentlemen told [Nolta] to tell her to tell us if we didn't testify we would be given money.

(Emphases added.) Without more, the exhortation "not to come back" is just that—a request that Zook not appear at trial without regard to whether she had (or had not) been served with a subpoena. Hence, that statement would not be sufficient to sustain a conviction under HRS § 710–1070(1)(b).[16]

The record reflects that Petitioner asked Schulte to request Zook "not to come to court" and not "to show up." Nolta testified Zook's response "was that she was subpoenaed," and therefore, had to testify. There is no mention at all by Petitioner of *avoiding*

---

15. Respondent's Answering Brief appears to indicate that the bribery case was focused on Zook's potential appearance at Petitioner's trial. ("[Petitioner] knew Zook was a percipient witness to the assault and *her absence from his trial* would be an effective means of undermining the prosecution's case against him.") However, the analysis of the sufficiency of the evidence with regard to the charge under HRS § 710–1070(1)(b) remains the same whether one is focused on Zook's appearing (1) at the preliminary hearing, (2) before the Grand Jury on the assault case if in fact Zook appeared at that proceeding, or (3) at trial. In all three scenarios, there is insufficient evidence to prove that Petitioner intended to induce Zook to avoid service of process summoning her to testify.

16. Although not cited by the parties, cases from other jurisdictions provide some examples of what conduct would support a finding that a defendant acted with the intent to induce a witness or potential witness to avoid service of process. For example, the Court of Appeals of Texas affirmed a defendant's conviction for tampering with a witness in violation of Vernon's Texas Statutes and Codes Annotated § 36.05(a)(3) (1997), where the defendant (1) informed the witness that she could avoid being subpoenaed if she remained 100 miles outside of Dallas, (2) paid her living and travel expenses to leave Dallas, (3) told the witness not to reveal where she was staying, and (4) paid for her to return to Dallas at the conclusion of the trial. *Arnold v. State*, 68 S.W.3d 93, 96 (Tex.Ct.App.2001).

service of a subpoena. There is also nothing in the evidence circumstantially indicating Petitioner's intent was to have Zook *avoid impending service.* Under the circumstances, a person exercising reasonable caution could not conclude that there was substantial evidence that Petitioner intended that Zook *avoid being served with a subpoena* compelling her to testify against him, as opposed to simply not "showing up" to testify against him.

## XII.

### A.

In its Answering Brief Respondent argues that the jury could have "rationally concluded" that (1) Petitioner "knew Zook was a percipient witness to the assault and her absence from his trial would be an effective means of undermining [Respondent's] case against him"; (2) "people generally know that they are subject to arrest for not appearing at a trial after accepting a subpoena"; (3) Petitioner "believed that without Zook as a witness [Respondent] would be unable to prosecute him"; (4) *Petitioner "would not have expected Zook* to risk running *too* far afoul of the law in order to assist him or jeopardize her own freedom by not appearing at his trial after she accepted a subpoena[,]" so "the jury could have reasonably inferred that *[Petitioner] made the offer believing that Zook would know she would not be subject to arrest* for not appearing to testify at his trial if she avoided being served with a subpoena" (some emphasis added); (5) "[b]y avoiding service of a subpoena Zook would assist [Petitioner] in accomplishing his goal of derailing [Respondent's] assault case against him without facing the specter of arrest for ignoring a subpoena"; (6) "not returning to Hawai'i would have been an effective means for Zook to avoid being served with a subpoena, and thereby preventing her from being legally obligated to appear at trial to testify against [Respondent]"; and (7) the "lack of evidence that [Petitioner] made any statements to the effect that Zook should avoid receiving legal

process" does not constitute a failure to prove that intent because (a) Petitioner "cites no authority that holds that such statements are the only evidence upon which his intent ... could be proved" and (b) "any such authority would seem to run counter to the spirit of [HRS] § 710–1070(1)(b), which ... is directed at preventing 'the harm that inheres in the attempt to interfere with the course of the official proceeding[,]' " (quoting Commentary to HRS § 710–1070). Respondent's brief fails to set forth how the jury could draw such inferences or conclusions from the evidence. Even when viewing the evidence in the light most favorable to Respondent, the conclusions and inferences offered to justify Petitioner's conviction for bribery are not supported by the record.

### B.

As to conclusions (1) and (3), although the jury could reasonably infer from the evidence that Petitioner knew Zook might be a witness in the assault case and that Respondent's case against Petitioner would be weaker if a "percipient witness" was not available to testify, that does not lead reasonably to a conclusion that Petitioner made the alleged offer with the intent to induce Zook to avoid service of process as opposed to simply not appearing at trial.

As to conclusion (2), Petitioner argues Respondent improperly contends that in the "absen[ce of] any evidence, the jury could essentially take judicial notice of [an] unspecified law to conclude that people generally know that they are subject to arrest for not appearing at a trial after accepting a subpoena." [17] Petitioner argues this conclusion "constitutes pure speculation" and cannot be deemed sufficient evidence to support Petitioner's conviction. In any event, assuming, *arguendo,* that people "generally know" a person who does not appear pursuant to a subpoena may be arrested, that would not support the conclusion that there was evidence Petitioner intended for Zook to "avoid" being *served,* as the indictment alleges.

---

**17.** Respondent does not cite authority to support the proposition that the jury may take "judicial notice" of any matter.

As to conclusion (4), Petitioner maintains that

> absolutely NO evidence was presented upon which the jury could conclude what [Petitioner] could or could not have expected Zook to do. Nor was any evidence presented upon which the jury could have inferred that [Petitioner's] offer was premised on his purported belief as to what Zook would know about her exposure (*i.e.*, that she could not be prosecuted for failing to appear at trial if she avoided service of a subpoena).... Any inferences drawn by the jury based on this type of "reasoning" constitutes pure speculation, rather than a conclusion based on substantial evidence.

(Capitalization in original.) The record is devoid of any evidence that could support conclusion 4. The evidence showed that Zook and Petitioner did not know each other. There was no evidence of any direct communication between Petitioner and Zook, much less any discussion regarding Zook's potential criminal liability and "how far" she would be willing to go to help Petitioner. Thus, as Petitioner correctly observes, there was no evidence "upon which the jury could conclude what [Petitioner] could or could not have expected Zook to do." Based on the evidence adduced, and without resorting to pure speculation, the jury could not reach any conclusion about what Petitioner would have expected Zook to do to help him.

Also, there was no direct or circumstantial evidence of Petitioner's intent to have Zook avoid receipt of a subpoena. The only evidence adduced at trial by Respondent was that Zook had already been subpoenaed when she received the alleged offer. Assuming that only Petitioner's belief as to whether Zook had not yet been subpoenaed was relevant, there is no evidence that Petitioner believed Zook had not yet received a subpoena.

As to conclusion (5), assuming, *arguendo,* that Zook could have avoided any legal obligation to testify at Petitioner's trial if she avoided being served with a subpoena, there is no mention of avoiding subpoenas made by Petitioner in the offer that was conveyed. Respondent does not cite to any evidence that Petitioner knew or believed a subpoena had yet to be served to compel Zook's appearance at the assault trial and thus intended to induce Zook to avoid a subpoena.[18]

As to conclusion (6), again the evidence adduced at trial was that Zook had already been subpoenaed (although this evidence is ambiguous as to what subpoena was involved) when she received the offer. There was no evidence that at the time of the offer Petitioner knew Zook was planning on leaving the jurisdiction or that he had asked her to leave or that he believed a subpoena had yet to be served on her. Thus, the conclusion that Zook could have successfully avoided service of process by leaving Hawai'i cannot, without more, prove that Petitioner intended to induce Zook to avoid service of process.

Finally, as to conclusion (7), Petitioner responds that "[Respondent] cites to no non-statement evidence of [Petitioner's] purported intent that Zook should avoid receiving any subpoena." Moreover, as observed *supra*, Respondent's suggested course, which would essentially allow any evidence of a bribe to satisfy any of the three subsections under HRS § 710–1070(1), would "run counter" to the legislature's intention to create three distinct culpable acts. *See* Commentary to HRS § 710–1070 (stating that "each part of the process [of obtaining witness tes-

---

18. In its Answering Brief Respondent implies that Petitioner sought to have Zook avoid a trial subpoena.

> On the other hand, the cumulative force of the evidence and the reasonable inferences that could be drawn therefrom when properly viewed in the light most favorable to the prosecution support the conclusion that [Petitioner] made his offer with the intent to induce Zook to avoid being served with a subpoena for his upcoming assault trial. *Accord, [Pone],* 78 Hawai'i [at] 265, 892 P.2d [at] 458.

Even focusing exclusively on Zook's potential appearance at trial, the evidence viewed in the light most favorable to Respondent does not support this conclusion. The direct evidence of Petitioner's state of mind, *i.e.,* his statements, merely indicates that he intended for Zook not to appear at trial. Moreover, there is no circumstantial or other evidence that would contradict the plain meaning of Petitioner's statements and lead one to conclude that what Petitioner actually intended was for Zook to avoid being served with a subpoena.

timony] is of unique importance in assuring the availability and integrity of the witness").

## XIII.

To read HRS § 710–1070(1)(b) as encompassing statements merely requesting that a potential witness "not show up" at trial would broaden HRS § 710–1070(1)(b) beyond its express language and blur the distinction between inducing a witness to avoid receiving a summons to testify and inducing someone who has been summoned to disobey such a summons. For, if asking a witness "not to show up" at a trial could be used to support a conviction for inducing a person to avoid service of process, HRS § 710–1070(1)(b) would swallow up HRS § 710–1070(1)(c), contrary to the plain language of the statute. Thus were this court to interpret HRS § 710–1070(1)(b) as urged by Respondent, such interpretation would render the other subsections of HRS § 710–1070(1) a nullity. *See City & County of Honolulu v. Hsiung*, 109 Hawai'i 159, 173, 124 P.3d 434, 448 (2005) (noting that this court has held that "our rules of statutory construction requires us to reject an interpretation of a statute or an ordinance that renders any part of the statutory language a nullity" (internal quotation marks and citation omitted)). HRS § 710–1070(1)(c) would then be rendered superfluous, in violation of the "cardinal rule of statutory construction" that, if possible, "no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *In re Waikoloa Sanitary Sewer Co., Inc.*, 109 Hawai'i 263, 273, 125 P.3d 484, 494 (2005) (quoting *Coon v. City & County of Honolulu*, 98 Hawai'i 233, 259, 47 P.3d 348, 374 (2002)) (internal quotation marks omitted). To hold otherwise would also result in an absurd interpretation of the express language of HRS § 710–1070(1)(b). *See Tauese v. State, Dep't of Labor & Indus. Relations*, 113 Hawai'i 1, 31, 147 P.3d 785, 815 (2006) (stating that this court is "bound to construe statutes so as to avoid absurd results" (internal quotation marks and citation omitted)).

## XIV.

For the foregoing reasons, the ICA gravely erred in upholding Petitioner's conviction for bribery under HRS § 710–1070(1)(b), and, therefore, the ICA's August 2, 2007 and the court's March 28, 2006 judgments are reversed as to the bribery count. As Petitioner has not contested the ICA's judgment with respect to Cr. No. 05–1–0661, the ICA's judgment is affirmed in all other respects.

## Dissenting Opinion by NAKAYAMA, J.

I respectfully dissent. In my view, the evidence was sufficient for the jury to infer Petitioner's intent to find him guilty of the offense of bribery of a witness, in violation of HRS § 710–1070(1)(b) (1993). This court has departed from a strict reading of the plain language of a statute when doing so would result in an "absurd or unjust result and such literal application is clearly inconsistent with the purposes and policies of the statute." *State v. Park*, 55 Haw. 610, 614, 525 P.2d 586, 589–90 (1974); *see State v. Bautista*, 86 Hawai'i 207, 209–10, 948 P.2d 1048, 1050–51 (1997) ("The legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." (Brackets, citation, and quotation marks omitted.)); *see also State v. Sylva*, 61 Haw. 385, 389, 605 P.2d 496, 498–99 (1980) (limiting construction of the plain language of HRS § 853–4(7) because, among other reasons, strictly adhering to its plain language would be inconsistent with our legislature's intent in enacting the statute). Specifically, we have long adhered to the rule of statutory construction that "even where there is no ambiguity, a departure from the literal application of statutory language will be justified if such literal application will lead to absurd consequences[,]" for "[s]tatutory language must be read in the context of the entire statute, and the harm or evil it seeks to prevent must point the way to its construction." *State v. Ogata*, 58 Haw. 514, 518, 572 P.2d 1222, 1225 (1977).

In this regard, I respectfully disagree with the majority's reliance on the plain language of HRS § 710–1070(1)(b). The majority concludes that reversal in this case is warranted

because, pursuant to the plain language of HRS § 710–1070(1)(b), there is a lack of evidence showing that Petitioner intended to induce Zook to avoid being served with a subpoena that would compel her to testify against Petitioner. Majority opinion at 229–30, 177 P.3d at 939–40. In so concluding, the majority dismisses, *inter alia,* Respondent's conclusion (7) inasmuch as, pursuant to the Commentary to HRS § 710–1070, "Respondent's suggested course[ ] ... would 'run counter' to the legislature's intention to create three distinct culpable acts." Majority opinion at 231, 177 P.3d at 941.

However, the Commentary to HRS § 710–1070 states that "[i]t is the risk of unreliable and false testimony that is the harm sought to be prevented[ ]" by the statute, for "the integrity of the witness' testimony is one of the fundamental requisites of our jurisprudential system." Accordingly, "substantial interference with *any part* of the process whereby a witness is called to testify in an official proceeding *is to be condemned.*" *Id.* (emphases added). Moreover, "since each part of the process is of unique importance in assuring the availability and integrity of the witness, *it follows that the sanction ought to be the same regardless of which part of this process is obstructed or perverted.*" *Id.* (emphasis added). As such, it is a person's intent to subvert this process and his actions thereto that HRS § 710–1070 guards against, *see* HRS § 710–1070(1) ("A person commits the offense of bribing a witness if he confers, or offers or agrees to confer, directly or indirectly, any benefit upon a witness or a person he believes is about to be called as a witness in any official proceeding *with intent to* [ ] ...." (emphasis added)), "regardless of which" specific part of the process is implicated by the person's actions. *See* Commentary to HRS § 710–1070.

In reviewing a denial of a motion for judgment of acquittal, the standard employed by this court is the same as that employed by the trial court; namely, "[t]he standard ... is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact], a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *State v. Keawe,* 107 Hawai'i 1, 4, 108 P.3d 304, 307 (2005). The evidence adduced at trial showed that Petitioner intended to induce Zook "not to show up to court and testify." Majority opinion at 221, 177 P.3d at 931. In light of the Commentary to HRS § 710–1070, and viewing the evidence "in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact]," *Keawe,* 107 Hawai'i at 4, 108 P.3d at 307, I believe that a jury could fairly infer Petitioner's intent based on the evidence adduced at trial, and therefore find Petitioner guilty of the offense of bribery of a witness, in violation of HRS § 710–1070(1)(b). Accordingly, I would hold that the circuit court did not err when it denied Petitioner's motion for a judgment of acquittal.

For the foregoing reasons, I would affirm the ICA's August 2, 2007 judgment, which affirms the first circuit court's March 28, 2006 judgment, and vacates the first circuit court's March 31, 2006 amended judgment and remands for entry of judgment consistent with the ICA's summary disposition order.